UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CANDACE N. BACA,                      )
                                      )
              Plaintiff,              )
                                      )
       v.                             )        No.  4:13CV1562 RWS
                                      )                        (TIA)
CAROLYN W. COLVIN,                    )
ACTING COMMISSIONER OF                )
SOCIAL SECURITY,                      )
                                      )
              Defendant.              )

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. § 405(g) for judicial review of the denial

of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security

Act.  The case was referred to the undersigned for a report and recommendation pursuant to 28

U.S.C. § 636(b).

## I.  Procedural History

On November 18, 2011, Plaintiff filed an application for Disability Insurance Benefits,

alleging that she became unable to work on September 25, 2011.  (Tr. 9, 106-07)  Plaintiff

claimed that she was disabled due to social anxiety caused painful attacks and severe hives;

social anxiety; anxiety; panic attacks; depression; history bipolar; history of mood disorder;

history of manic depression; extreme paranoid; fear of people; history of delusions.  (Tr. 52)

The application was denied initially on April 6, 2012, after which Plaintiff requested a hearing

before an Administrative Law Judge ("ALJ").  (Tr. 51-55, 58-59)  On January 18, 2013, Plaintiff

testified at a hearing before the ALJ.  (Tr. 24-41)   In a decision dated March 29, 2013, the ALJ

found that Plaintiff had not been under a disability from September 25, 2011 through the date of

the decision.  (Tr. 9-19)  On June 7, 2013, the Appeals Council denied Plaintiff's request for review.  (Tr. 1-3)  Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

## II.  Subjective Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel.  Plaintiff's attorney provided an opening statement, arguing that Plaintiff had been diagnosed with generalized anxiety disorder and panic disorder with agoraphobia.  In addition, she had a history of bipolar disorder and post traumatic stress disorder ("PTSD"), which combined rendered her unable to function in the work place.  Upon questioning from the ALJ, Plaintiff testified that she was born on May 28, 1985.  She was single with a seven-year-old daughter and a baby on the way.  Plaintiff lived with her mother, who was on disability, and her daughter.  Plaintiff drove short distances daily even though it made her nervous.  She had a GED and unsuccessfully attempted to take college courses.  Plaintiff had not worked or volunteered since September of 2011.  She had not filed for unemployment or worker's compensation benefits.  Although Plaintiff did not receive Medicaid, she did get $347 per month in food stamps.  Plaintiff was owed child support but did not know the amount.  (Tr. 26-31)

Plaintiff testified that she previously worked for HPCI doing data entry.  Her position required her to sit at a desk and enter information all day.  However, Plaintiff was fired for unknown reasons.  While Plaintiff stated she had not used alcohol in the past 10 years, she acknowledged that she had a drug addiction problem until she had her daughter.  Plaintiff previously used heroin, cocaine, and marijuana.  She also used prescription drugs that were not prescribed to her before her daughter was born.  She testified that she would no longer be able to

perform her data entry job because even when she worked there, she panicked when she had to talk on the phone or be around other people. (Tr. 31-34)

Plaintiff's attorney also questioned the Plaintiff regarding her previous employment. She stated that she was last employed through a temporary service in 2011. She worked in a factory packing medication. She stopped working because she broke out in hives and was taken to the hospital. She attributed the hives to anxiety. Plaintiff did not try to return to work because she was in and out of the hospital due to her panic disorder and anxiety. (Tr. 34-36)

During the day, Plaintiff took care of her daughter. She dropped her off and picked her up from school, which was about eight minutes from her home. She did not go out for any other reason besides doctors' appointments. She tried to grocery shop but sometimes had to leave because she became too anxious about people behind her in the checkout lane. Her mother would shop for her instead. Plaintiff stated that she stayed home, but she continued to experience anxiety attacks every day. To deal with the anxiety attacks, Plaintiff would get up and walk around, sit down, or maybe isolate herself. When she was too manic, upset, or emotional from anxiety, Plaintiff's mom watched her daughter. Plaintiff described her panic attacks as causing her to become sweaty and her surroundings to appear muffled. If she was in public, she needed to leave the area. The bad panic attacks caused hives. She testified that she experienced hives daily but lately the hives sometimes skipped a day and had been very mild. Plaintiff did not get together with friends or go to movies. She was recently hospitalized for five days because she was manic and could not calm down. Plaintiff's attorney also asked about a PTSD diagnosis. Although Plaintiff stated she was unaware that she had that condition, she testified that she had been raped as a teenager. Her medications helped a little, but she was still

unable to go out and be around people.  (Tr. 36-40)

On December 4, 2011, Plaintiff completed a Function Report – Adult.  She stated that her daily activities included waking up and getting her daughter ready for school.  A friend would take her daughter to school if Plaintiff was too anxious.  On bad days, Plaintiff slept, paced, or just sat around the house.  If she had to go to the store, she became anxious and broke out in hives.  She had trouble sleeping, and she wore the same clothes for days when depressed.  Plaintiff was able to prepare sandwiches and simple foods on a daily basis.  In addition, she could do laundry and perform basic cleaning; however, she took hours to do her chores because she became overwhelmed.  Plaintiff tried to go outside a little bit every day.  She grocery shopped once a week for about 20 minutes.  She no longer had hobbies.  She spent time with other people about twice a month.  Plaintiff reported that she may watch a movie with friends until she became anxious and asked them to leave.  Plaintiff did not have problems getting along with others.  She stated that her conditions affected her ability to stand, walk, talk, see, remember, complete tasks, concentrate, follow instructions, and use hands.  In addition, Plaintiff reported that she could not pay attention for very long, nor could she finish what she started.  She skipped around on written instructions and had trouble remembering spoken instructions.   She got along okay with authority figures.  However, she became manic with stress and could not handle change.  (Tr. 160-67)

On February 10, 2013, the ALJ issued interrogatories to a Vocational Expert ("VE"), which the VE completed on February 19, 2013.  The VE indicated that Plaintiff's past relevant work included office clerk, hand packager, and cashier-checker.  In the interrogatories, the ALJ asked the VE to assume a hypothetical individual born May 28, 1985 with at least a high school

education and the ability to communicate in English. The person had the work experience noted above. Further, the individual had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels. Nonexertional limitations included work involving only simple, routine, and repetitive tasks; low stress work requiring only occasional decision making and occasional changes in the work setting; no interaction with the public; only casual and infrequent contact with coworkers; and contact with supervisors about work duties (when those duties are performed satisfactorily) to occur no more than four times per workday. In light of this hypothetical, the VE stated that the hypothetical individual could perform Plaintiff's past job as a hand packager. Additionally, the person could perform other unskilled work in the local and national economies including housekeeping cleaner, dishwasher, and hand packager. (Tr. 188-95)

### III.  Medical Evidence

On October 20, 2011, Plaintiff presented to the emergency room at St. Anthony's Medical Center for complaints of an itchy rash on her entire body. She reported symptoms for a few days. The physician diagnosed urticaria (hives) and recommended Benadryl. (Tr. 233-35)

On November 1, 2011, Plaintiff complained of generalized rash for a week. (Tr. 263)  On November 2, 2011, Plaintiff returned to St. Anthony's Medical Center emergency room due to a generalized and progressively worsening rash for 3 weeks. Records indicated a past medical history of anxiety. The examining physician diagnosed hives and prescribed Hydroxyzine. (Tr. 205-08)

Plaintiff returned to the emergency room on the same date, reporting shortness of breath, chest pain and rash for 3 weeks. The examining physician diagnosed urticaria, prescribed

Prednisone and Hydroxyzine, and instructed Plaintiff to follow up for additional treatment. (Tr. 213-30)

On November 12, 2011, Plaintiff visited the Jefferson Regional Medical Center emergency room for complaints of hives induced by social anxiety, as well as difficulty breathing and a swollen tongue. She reported symptoms for the past six weeks with no relief from Atarax. Plaintiff also reported a history of social anxiety. In addition, Plaintiff stated that she experienced chest wall pain with anxiety, but had no current chest pain. Previous cardiac work-ups were negative. The staff administered steroids and anti-anxiety medications, and Plaintiff was discharged with diagnoses of urticaria NOS and allergic urticaria. She was prescribed Prednisone. (Tr. 242-57)

On November 17, 2011, Plaintiff visited Comtrea based on a referral for an urgent appointment. Plaintiff reported that she struggled with anxiety since she was a child and that she avoided situations resulting in depression due to isolation. She also reported experiencing panic attacks a couple times per day which caused chest pain and hives. Additionally, she stated that during a panic attack, her throat swelled, and she had trouble breathing. Plaintiff indicated that she had gone to the ER about 10 times in the past year, with no admissions. She worried about everything but did not experience mood swings. Mental status examination revealed an anxious and withdrawn mood and affect, poor memory, and limited insight. Katie Speck, MA, PLPC, CCM also noted that Plaintiff was a poor historian with difficulty recalling recent events and connecting them with a time line. Further, she reported a history of being raped at ages 15 and 18, as well as being physical abused by her mother's girlfriend. Plaintiff also denied current alcohol or drug use, but Ms. Speck noted that Plaintiff was vague and responded in a

questionable manner.  Ms. Speck diagnosed panic disorder with agoraphobia; generalized anxiety disorder; and a Global Assessment of Functioning ("GAF") of 50.  (Tr. 310-12)

On November 30, 2011, psychiatrist Jhansi Vasireddy, M.D., evaluated Plaintiff for complaints of anxiety.  Plaintiff reported social anxiety all her life, but that the anxiety had become progressively worse over the past five months.  She stated that she got hives when she was around people.  In addition, she reported shortness of breath several times in the last few months, as well as emergency room visits.  Plaintiff stated that she was previously diagnosed with bipolar disorder and was hospitalized twice before age 14.  She again reported prior rape and physical abuse which caused nightmares and flashbacks.  Further, she stated that her anxiety was so bad lately that her throat swelled up.  Plaintiff had a history of IV heroin, cocaine, and marijuana use.  She last used marijuana a year ago.  Mental status examination revealed some anxiousness, which caused her face to become flush.  She had no shortness of breath.  She expressed feelings of helplessness and anxiety, which became worse when she was in crowds of people.  Dr. Vasireddy diagnosed generalized anxiety disorder; panic disorder with agoraphobia; posttraumatic stress disorder; a history of bipolar mood disorder; and a GAF of 55.  Dr. Vasireddy also prescribed Celexa, Klonopin and Vistaril.  (Tr. 320-22) rules

Plaintiff returned to Dr. Vasireddy on December 14, 2011 for medication management and supportive psychotherapy.  She reported that the Klonopin helped with her anxiety but she still had some anxiety.  She did not take Vistaril because it was too expensive but took Benadryl.  She reported homelessness and moving from home to home while her daughter stayed with Plaintiff's mother.  Mental status examination indicated that Plaintiff's mood and affect were mildly constricted.  She reported anxiety, decreased energy, and decreased motivation.  Her

insight and judgment were fair.  Dr. Vasireddy again diagnosed generalized anxiety disorder; panic disorder with agoraphobia; posttraumatic stress disorder; a history of bipolar mood disorder; and a GAF of 60.  Dr. Vasireddy continued Celexa and increased Klonopin to three times a day.  (Tr. 318)

On January 11, 2012, Plaintiff presented to the St. Joseph Health Center emergency room due to hives that first developed four months ago.  She experienced hives every few days, often when she was stressed.  Plaintiff last took Prednisone two weeks ago.  She reported that Vistaril did not work and that Benadryl made her tired.  Plaintiff's mood, memory, affect, and judgment were normal.  Plaintiff was given Prednisone and Claritin, which faded the hives somewhat.  The ER physician assessed urticaria and prescribed Allegra and Prednisone.  (Tr. 420-32)

On February 1, 2012, Plaintiff followed up with Dr. Vasireddy for a 17-minute appointment.  She reported continued anxiety, with stressors in her life making the anxiety worse.  She stopped taking Celexa because she felt more depressed when she took it.  The Klonpin helped, and she was able to take care of her daughter and drive her to school and around town.  Plaintiff reported a recent visit to the emergency room for a severe allergic reaction that caused hives and an inability to breathe.  She took over-the-counter allergy medications sometimes but not often due to financial problems.  Mental status examination again revealed decreased energy, decreased motivation, anxiety, and mildly constricted mood and affect.  Dr. Vasireddy diagnosed generalized anxiety disorder; panic disorder with agoraphobia; posttraumatic stress disorder; a history of bipolar mood disorder; and a GAF of 60.  He advised Plaintiff to continue Klonopin and Celexa and return in four weeks.  (Tr. 335-36)

Plaintiff returned to Dr. Vasireddy on March 8, 2012 for medication management and

supportive psychotherapy.  Plaintiff reported that she did not fill her prescriptions due to financial problems and that she was feeling anxious.  She stated that she was practically homeless and spending what little money she had to drive her daughter around.  Plaintiff noted that Klonopin helped with her anxiety and that she had not gone to the ER for anxiety.  Mental status examination revealed decreased energy, increased anxiety, and mildly constricted mood and affect.  She reported being  overwhelmed with financial and family stressors.  Dr. Vasireddy noted no mood swings, irritability, or anxiety during the interview.  He gave the same diagnosis as previous visits, with a GAF of 60.  (Tr. 344)

On April 25, 2012, Plaintiff presented to the Jefferson Regional Medical Center ER for complaints of hives.  She refused to take Benadryl due to side effects, including sleepiness. During the exam, Plaintiff s affect and mood were appropriate.  The ER physician diagnosed an unknown allergic reaction and prescribed Prednisone.  (Tr. 399-401)

On April 30, 2012, Plaintiff again saw Dr. Vasireddy to manage her medications and for brief supportive psychotherapy.  Dr. Vasireddy noted inconsistent stories regarding Plaintiff's Klonopin prescription.  Plaintiff had stopped taking Celexa because it made her depressed. Plaintiff reported decreased energy, decreased motivation, and anxiety.  However, Dr. Vasireddy noted no anxiety during the exam.  Plaintiff's diagnosis remained the same, and Dr. Vasireddy continued the Klonopin and prescribed Cymbalta.  (Tr. 342-43) After the interview, Plaintiff saw Amy Phillips, LPC, for community support.  Plaintiff reported that things had become worse, including her situation and the panic attacks.  Her disability was denied, and she stayed in her car lately due to lack of permanent housing.  Plaintiff also reported suicidal thoughts with no intent. Treatment goals included overcoming panic attacks and social anxiety, as well as keeping

appointments with her psychiatrist and taking medications as prescribed. (Tr. 371-72) On May 24, 2012, Plaintiff reported to Ms. Phillips that she missed a doctor's appointment because her significant other had beaten her, requiring her to get a restraining order. (Tr. 368)

Plaintiff saw C.J. Jos, M.D., on July 19, 2012. Treatment notes indicated that Plaintiff was transferred to this new psychiatrist because she had issues with her previous provider. She reported suffering anxiety attacks for a long time, usually precipitated by crowds and strange places. In addition, she experienced hives and multiple somatic symptoms associated with each attack. She also reported a history of cutting herself, attempting suicide, abusing drugs during her teen years, and suffering from depression and anxiety. Plaintiff told Dr. Jos that her medications were not helping and that she preferred to be off medications due to poor response and pregnancy. Mental status exam was normal. Dr. Jos diagnosed panic attacks with agoraphobia; personality disorder with paranoid and borderline traits; and a GAF of 65. Dr. Jos instructed Plaintiff to see a caseworker for counseling and return to Dr. Jos in three months. (Tr. 340-41)

Individual progress notes pursuant to a phone call on August 24, 2012 reveal that Plaintiff reported doing okay. (Tr. 362) On August 29, 2012, Plaintiff reported that she was off her psychotropic medications due to her pregnancy and that she had anxiety symptoms since November with no effective coping skills. She experienced anxious thoughts about other people in social settings. Additionally, she did not find relief from participating in activities such as meditation, and she reported not wanting to hang out with her friends. (Tr. 360-61)

Plaintiff returned to Dr. Jos on October 8, 2012 for a 15 minute psychiatric follow up. She reported that her pregnancy was going well. However, she was suffering from panic attacks

10

and found it hard to leave the house even with her mother.  She requested anti-anxiety medication, and Dr. Jos decided to try BuSpar.  Dr. Jos assessed panic attacks with agoraphobia; personality disorder with paranoid and borderline traits; and a GAF of 65.  (Tr. 339)  On that same date, Plaintiff met with Jeffrey Best, LSCW.  Plaintiff stated that her level of anxiety had worsened such that she couldn't go to restaurants or see friends that visited.  Plaintiff was aware that she could receive counseling services but declined at that time.  (Tr. 356-57)

On November 8, 2012, Dr. Jos saw Plaintiff for a 15 minute psychiatric evaluation. Plaintiff reported a high stress level due to issues with the father of her baby.  She sought medications for anxiety and insomnia.  On examination, Plaintiff was agitated and teary-eyed. Dr. Jos assessed agoraphobia with panic attacks; personality disorder with paranoid and borderline traits; and a GAF of 60.  Dr. Jos also discontinued BuSpar and prescribed Seroquel. (Tr. 337)  After seeing Dr. Jos, Plaintiff met with Mr. Best and appeared to have low energy and insight.  Plaintiff provided limited information about her health, family, mental health, and community progress.  (Tr. 355)

During Plaintiff's annual evaluation at Comtrea on November 12, 2012, she reported being stressed about her pregnancy.  Mental status screening revealed anxious mood and flat affect, as well as phobias of being around crowds.  Plaintiff reported having suicidal thoughts earlier in the year, denied abusing alcohol or prescription medications during the year, admitted to smoking marijuana once in May before she knew she was pregnant, and acknowledged smoking a pack of cigarettes a day prior to her pregnancy.  Mr. Best noted that Plaintiff continued to struggle managing her symptoms.  She reported feeling anxious all the time, with symptoms including faster heartbeat, racing thoughts, and panic.  Plaintiff also reported

experiencing depression, isolating herself from others, and getting little sleep. She was unable to spend time with other people or enjoy things she used to do. Plaintiff decided to discontinue counseling sessions through Comtrea even though she was eligible for services. Mr. Best diagnosed panic disorder with agoraphobia; panic disorder NOS with paranoid and borderline traits; and a GAF of 65. (Tr. 350-52)

Comtrea records dated November 15, 2012 indicated that the Division of Developmental Disabilities contacted Comtrea with information that Plaintiff sought assistance for her increased level of anxiety and depression. (Tr. 348) On the same date, Plaintiff presented to the St. Anthony's Medical Center ER complaining of anxiety and depression. She reported that BuSpar did not help, and she sought medication that would work quicker. Plaintiff also reported nausea and vomiting, which she attributed to being upset and anxious. Psychiatric exam revealed flat affect, but Plaintiff did not appear anxious. The ER contacted Dr. Jos, who noted that Plaintiff was not taking BuSpar because she was concerned it would harm the baby. Dr. Jos recommended BuSpar three times a day. Plaintiff refused a prescription for Zoloft. Plaintiff was discharged in good condition with a diagnosis of anxiety. (Tr. 402-06)

On November 16, 2012, Plaintiff spoke via phone to Mr. Best at Comtrea for three minutes. She reported experiencing significant anxiety and panic attacks. She did not need an earlier counseling appointment because she had enough medication until her next appointment. (Tr. 346-47)

Plaintiff went to the ER at St. Clare Health Center on November 17, 2012 for severe and worsening anxiety. She admitted that she was losing it and thought she would hurt the baby. Plaintiff's symptoms included depression, suicidal thoughts, homicidal thoughts, agitation,

anxiety, stress, bizarre behavior, aggressive behavior, and nervousness. Examination revealed anxious, agitated, and depressed mood; homicidal ideation (threatening to kill her daughter); and disordered thought content. Plaintiff was diagnosed with anxiety and suicidal ideation and transferred for inpatient treatment. Plaintiff's GAF on admission was 30. (Tr. 378-85)

Plaintiff received inpatient treatment from November 18, 2012 through November 23, 2012. While hospitalized, Plaintiff was treated with BuSpar and Remeron until stabilized. Plaintiff also participated in daily treatment groups. She was safe and stable at the time of discharge. Plaintiff agreed to take her medications and follow up with Dr. Jos. Plaintiff's discharge diagnosis was depression with anxiety and a GAF of 46-50. (Tr. 437-46)

On March 14, 2012, Marsha Toll, PsyD, performed a consultative examination based on the medical records in evidence at that time. Dr. Toll found that Plaintiff's allegations were partially credible. Her anxiety disorder had recently worsened but improved with medication. Despite the reported severity, Plaintiff was able to care for her household and child. Further, Dr. Toll found Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. In addition, Dr. Toll opined that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, ability to carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors. Dr. Toll opined that Plaintiff had the capacity to acquire and understand at least simple instructions and was able to sustain concentration, persistence, and pace through simple tasks. Further she could relate

adequately to others in settings not requiring frequent public contact or unusually close
interaction, as well as adapt to a non-complex work environment.  (Tr. 42-50)

### IV.  The ALJ's Determination

In a decision dated March 29, 2013, the ALJ found that Plaintiff met the insured status
requirements of the Social Security Act through March 31, 2014.  She had not engaged in
substantial gainful activity since September 25, 2011.  Further, the ALJ determined that Plaintiff
had the severe impairments of generalized anxiety disorder, agoraphobia with panic attacks,
personality disorder, and posttraumatic stress disorder.  However, she did not have an
impairment or combination of impairments that met or medically equaled the severity of one of
the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 9-13)

After carefully considering the entire record, the ALJ found that Plaintiff had the RFC to
perform a full range of work at all exertional levels.  In addition, she was limited to work that
involved only simple, routine, and repetitive tasks, as well as low-stress jobs requiring only
occasional decision making and changes in the work setting.  Plaintiff was limited to no
interaction with the public, only casual and infrequent contact with coworkers, and contact with
supervisors concerning work duties (when work duties are being performed satisfactorily)
occurring no more than four times per workday.  The ALJ further determined that Plaintiff was
unable to perform any past relevant work.  In light of her younger age, at least a high school
education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in
the national economy which Plaintiff could perform.  These jobs included housekeeper/cleaner,
dishwasher, and hand packager.  Therefore, the ALJ concluded that Plaintiff had not been under
a disability, as defined in the Social Security Act, from September 25, 2011 through the date of

the decision.  Because the decision was unfavorable, Plaintiff's prior substance abuse was not

material to the decision.  (Tr. 13-19)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers

from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines

disability as "the inability to do any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R.

§ 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step

evaluation process. See 20 C.F.R. § 404.1520(b)-(f).  Those steps require a claimant to show: (1)

that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or

combination of impairments which significantly limits her physical or mental ability to do basic

work activities; or (3) she has an impairment which meets or exceeds one of the impairments

listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work;

and (5) her impairments prevent her from doing any other work.  Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence.

42 U.S.C. § 405(g).  "Substantial evidence 'is less than a preponderance, but enough so that a

reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d

1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The

Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robinson

v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  Instead, even if it is possible to draw two

different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to

plaintiff's complaints under the <u>Polaski</u>[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. <u>Marciniak</u> 49 F.3d at 1354.

## VI. Discussion

In her Brief in Support of the Complaint, the Plaintiff asserts that the ALJ erred in determining Plaintiff's RFC by failing to find additional limitations, improperly analyzing evidence, making findings inconsistent with findings at step 3, failing to properly analyze her non-severe impairments, and failing to sufficiently cite evidence supporting the RFC determination. Plaintiff also argues that the ALJ erred in determining that Plaintiff could perform other work because the VE's evidence was inconsistent with the Dictionary of Occupational Titles. Finally, Plaintiff contends that the ALJ improperly analyzed Plaintiff's credibility and failed to conduct the proper credibility analysis. The Defendant, on the other hand, maintains that substantial evidence supports the ALJ's RFC finding and credibility determination. Further, Defendant asserts that the VE evidence provided substantial evidence to support the ALJ's decision. The undersigned finds that the ALJ did not properly assess Plaintiff's RFC such that the case should be remanded to the ALJ for further review.

---

[1]The <u>Polaski</u> factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).

Residual Functional Capacity (RFC) is a medical question, and the ALJ's assessment must be supported by substantial evidence. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1). "Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996) (emphasis present).

The ALJ has the responsibility of determining a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). "An 'RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" Sieveking v. Astrue, No. 4:07 CV 986 DDN, 2008 WL 4151674, at *9 (E.D. Mo. Sept. 2, 2008). Further, "[t]he ALJ's RFC determination must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Tinervia v. Astrue, No. 4:08CV00462 FRB, 2009 WL 2884738, at *11 (E.D. Mo. Sept. 3, 2009) (citations omitted); see also Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (citations omitted) (finding that medical evidence "must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' . . .

18

.").  In addition, it is well settled "that it is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel."  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted).  The ALJ may not rely upon his or her own inferences.  Id. at 858.

Here, in making the RFC determination, the ALJ fails to support his findings with specific medical evidence.  Indeed, the RFC finding sets forth several specific limitations, yet the opinion contains no discussion of how the medical evidence supports each limitation.  Plaintiff also argues that the ALJ failed to account for all of the limitations stemming from her impairments.  The record shows that none of the examining physicians addressed Plaintiff's ability to function in the workplace.  Instead, the ALJ appears to rely primarily on the assessment of a non-examining state agency psychologist to determine Plaintiff's capabilities in the work place.  The record also indicates that, although not specifically referenced, the ALJ's RFC determination essentially mirrored the RFC assessment by Dr. Toll, the non-examining consultative psychologist.  (Tr. 13, 42-50)  Where an ALJ implicitly relies on a nonexamining state medical consultant, the ALJ must explain the weight given to the consultant's opinion.  Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008) (citation omitted).   "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole."  Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir.2002).  The SSA regulations recognize "because nonexamining sources have no examining or treating relationship with [the claimant], the weight [the SSA] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. § 404.1527(d)(3).  By explaining this weight, especially in light of the fact

that none of Plaintiff's treating psychiatrists addressed her ability to function in the work place, the ALJ would have complied with regulations and aided the Court in reviewing the determination.  Willcockson, 540 F.3d at 880.

Further, although Defendant asserts that the ALJ's reliance on treatment records is sufficient medical evidence to support the RFC finding, the ALJ's opinion fails to indicate what medical evidence describes Plaintiff's functional limitations.  See Whitehead v. Astrue, No. 4:10CV1066 FRB, 2011 WL 3943921, at *22 (E.D. Mo. Sept. 7, 2011) (remanding where the ALJ's decision was unclear as to what medical evidence he relied on to formulate plaintiff's RFC).  The RFC analysis merely sets forth Plaintiff's medical history without indicating what evidence supports the specific limitations in the RFC determination.  While the ALJ need not present his RFC findings in rigid, bullet point format with each limitation followed by supporting evidence, the RFC assessment must include some narrative discussion describing how the evidence supports each conclusion so the ALJ does not overlook any limitations. Chaplin v. Astrue, No. 4:09cv1384 TCM, 2010 WL 3843643, at *15 (E.D. Mo. Sept. 27, 2010) (citations omitted).  Here, nothing in the medical evidence cited by the ALJ indicates how that evidence supports the very detailed limitations.  Thus, the cause should be remanded to the ALJ for further review.

While the undersigned questions whether Plaintiff is disabled, the ALJ has the responsibility to support the RFC determination with medical evidence that addresses the Plaintiff's ability to function in the workplace.  To the extent that the record is insufficient, the ALJ should re-contact the examining psychiatrists or order further consultative examinations that specifically address Plaintiff's RFC.

Accordingly,

**IT IS HEREBY RECOMMENDED** that this cause be **REMANDED** to the

Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written

objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an

extension of time for good cause is obtained, and that failure to file timely objections may result

in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir.

1990).


/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  27th  day of August, 2014.